R. READY PRODUCTIONS, INC., et al., Plaintiffs,

v.

Anthony C. CANTRELL, et al., Defendants.

No. Civ.A.H–98–0401.

United States District Court, S.D. Texas, Houston Division.

Jan. 7, 2000.

R Mark Ramsey, Ramsey & Murray, Houston, TX, for Apple Chevrolet Incorporated, movant.

John T Klug, Broocks Baker et al, Houston, TX, for Torrado Chrysler Plymouth Jeep Eagle, Brasada Ford Ltd., Austin Pontiac Ltd., McCombs Austin Inc., Atrm Ltd., Red McCombs Motors Inc., Hemphill Ford Center Inc., McCombs-Hendrix GMC, amicus.

Lee L Kaplan, Smyser Kaplan & Veselka, Houston, TX, for Texas Automobile Dealers Association aka TADA, amicus.

Myall S Hawkins, Lisa H Meyerhoff, Jenkens & Gilchrist, Houston, TX, for Anthony C Cantrell, Automotive Consulting Company, defendants.

William Fred Hagans, Hagans & Bobb, Houston, TX, Robert G McConn, Jr, McConn & Williams, Houston, TX, for R Ready Productions Inc, CSI Direct, Robert Ready, plaintiffs.

### MEMORANDUM OPINION AND ORDER

ATLAS, District Judge.

Pending before the Court in this copyright case is the Motion for Summary and Declaratory Judgment ("Defendants' Motion") [Doc. # 31] filed by Defendants Anthony C. Cantrell and Automotive Consulting Company. Plaintiffs Robert Ready, R.

Ready Productions, Inc., and CSI Direct have responded in opposition. *See* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs' Opposition") [Doc. # 41]. In addition, Plaintiffs, Defendants and other third parties have filed pleadings.[1] The Court has considered Defendants' Motion, Plaintiffs' Response, all matters of record, and the applicable authorities, and concludes that Defendants' Motion should be **GRANTED in part and DENIED in part.**

### I. *FACTUAL BACKGROUND*

*Overview.*—This dispute involves the promotion of retail automobile sales through the use of targeted mailings. Plaintiff R. Ready Productions ("Ready Productions"), formed in 1993 by Plaintiff Robert Ready ("Ready"), is a marketing company that specializes in sales promotions for automobile dealerships. As part of its business, Ready Productions produces and mails a direct mail solicitation letter ("advertising letter") which is sent to selected customers. In 1995, Plaintiffs obtained a copyright for two of its advertising letters. This dispute concerns the legality of Defendants' use of mail solicitations very similar to the copyrighted advertising letters.[2]

In March 1995, Defendant Anthony Cantrell ("Cantrell") began work for Ready Productions as a salesman. He later became an independent contractor. *See* Independent Contractor Agreement, Plaintiffs' Response, Defendants' Reply, Exhibit 9. Cantrell soon left Ready Productions

---

1. Defendants have filed a Reply Brief to Plaintiffs' Response ("Defendants' Reply") [Doc. # 48]. Plaintiffs filed an Opposition to Certain Dealer's Amicus Curiae Brief and Surreply to Defendants' Motion for Summary Judgment ("Plaintiffs' Sur–Reply") [Doc. # 57]. Defendants in turn filed a Reply to Plaintiffs' Sur–Reply [Doc. # 58].
 In addition, the Court has granted two separate motions to parties allowing the filing of *amicus* briefs, one from an *ad hoc* group of automobile dealers and one from the Texas Automobile Dealers Association. *See* Court's

November 16, 1999 Order [Doc. # 52] and December 31, 1999 Order [Doc. # 62]. Both parties have file *amicus* briefs. *See* Certain Dealers Amicus Briefs in Support of Defendants' Motion for Summary Judgment [Doc. # 44]; Texas Automobile Dealers Association's Amicus Brief in Support of Defendants' Motion for Summary Judgment [Doc. # 54].

2. Defendants do not deny that Defendants' letters are very similar to Plaintiffs' copyrighted works.

and started his own business, Defendant Automotive Consulting Company ("ACC") in October 1995. ACC also conducts sales promotions for automobile dealerships. At ACC, Cantrell used advertising letters similar to the ones used by Ready Productions. *See* Comparisons of ACC advertising letters and Ready Production advertising letters, Plaintiffs' Response, Exhibits H–J.

***Early Promotional Materials and Creators.***—The history of direct mail promotions in retail automotive sales, however, reaches far beyond the litigants involved in this case. In 1988, Kevin Bone ("Bone") started a direct mail business in Southern California with Randall Silbert ("Silbert"). *See* Deposition of Kevin Bone ("Bone Deposition"), Appendix to Defendants' Motion for Summary Judgment [Doc. # 33] ("Defendants' Appendix"), Exhibit 9, at 9. The name of this business originally was Ritz Promotions. Ritz Promotions was incorporated on June 10, 1988 in California. *See* Defendants' Reply, Exhibit 11 ("Status Inquiry Report" from California Secretary of State); Defendants' Reply, Exhibit 7, Deposition of Randall Silbert ("Silbert Deposition"), at 17.[3] Bone and Silbert incorporated their business formally as "The Ritz Corporation" on January 19, 1989, but continued to use the name "Ritz Promotions" and the same mailing address. *See* Defendants' Appendix, Exhibit 11. From 1988 to approximately 1991, The Ritz Corporation (or a predecessor corporation) operated in several cities in Southern California and Florida. *See* Bone Deposition, at 10–11. The company's focus was the promotion of retail sales of automobiles through the use of direct mailings known as, "advertising letters" or "mailers." *Id.* at 29; *see also* Example of Ritz Mailers, Defendants' Reply, Exhibit 3, at 2–3. These advertising letters were sent to selected potential automobile purchasers,

and essentially stated that the recipient was invited to an exclusive, day-long, sales event where a particular automobile dealership would sell its inventory of automobiles at very low prices. *See id.*

Bone achieved some recognition in the automotive direct mail promotions industry. He states that he was thought of as a founder of the industry and his advertising letters have been copied by "quite a few people" in different parts of the country. *See* Bone Deposition, at 207–08. In terms of his reputation, he states that "[p]eople refer to me as—I hate to use the terminology, but for lack of a better word, I've heard the king." *Id.* at 208.

In or about early 1990, James Kennedy ("Kennedy"), a salesman with The Ritz Corporation, resigned and started his own automotive direct mail business named Kennedy Promotions. *See* Deposition of James Kennedy ("Kennedy Deposition"), Defendants' Appendix, Exhibit 13, at 58, 76. This then became the Presidential Group ("Presidential") when Silbert and several other salespeople left The Ritz Corporation and joined Kennedy. *Id.* at 59. Presidential also engaged in direct mail automobile sales promotions, and it used advertising letters that were almost identical to those used by Ritz. *See* Examples of Presidential Materials, Defendants' Reply, Exhibit 4, at 2–3.

Silbert's involvement with Presidential triggered a lawsuit by Bone against Silbert; The Ritz Corporation later cross-claimed against Silbert and Presidential. *See* Cross–Complaint filed in Orange County, California. *Bone v. Silbert,* Cause Nos. 643804 and 644426 ("Bone/Ritz Suit"). Defendants' Appendix, Exhibits 15, 16. In its cross-complaint, The Ritz Corporation alleged that Silbert and Presidential

> had improperly used THE RITZ CORPORATION's client list and other documentary and proprietary information including promotional material informa-

---

**3.** The California records indicate that the status of the corporation, Ritz Promotions, be

came "PTB Susp." on October 1, 1990. *Id.*

tion in order to solicit prospective and actual business of THE RITZ CORPORATION.

Defendants' Appendix, Exhibit 16, at 4, ¶ 16. A settlement was eventually reached in which Silbert agreed to transfer all his stock in The Ritz Corporation back to that corporation. *See* Transcript of Proceedings in the Bone/Ritz Suit, Defendants' Appendix, Exhibit 17, at 10.

***Ready's Involvement.***—Plaintiff Ready joined Presidential in March 1991 as a sales trainer. When he joined Presidential, Ready had no experience in direct mail promotions in the automobile industry. *See* Deposition of Robert Ready ("Ready Deposition"), Defendants' Appendix, Exhibit 5, at 20–21. While employed with Presidential, Ready occupied positions of sales trainer, sales representative, and major accounts representative. *Id.* at 283–84. Ready admitted that he never helped develop direct mail materials for Presidential. *Id.* at 55. Moreover, he does not claim he has any ownership interest in Presidential's or The Ritz Corporation's materials. *Id.* at 55–56.

In June 1992, Ready and Silbert started a new partnership in California named Premier Productions ("Premier").[4] *See* Ready Deposition, at 58–59. Premier was involved in the same promotion business as Ritz and Presidential. Ready admits that Silbert used documents originally obtained from both Ritz and Presidential in developing Premier's materials. *Id.* at 74. In September 1992, Ready and Silbert moved to Texas and filed a "doing business as" certificate for the name "Premier Productions." Ready states that he explained to Silbert "that we needed to move so that we were not competing nor were we going up against The Presidential Group or The Ritz. . . ." *Id.* at 71–72.

Ready ended his partnership with Silbert in August 1993. That same month, he formed R. Ready Productions, the second Plaintiff in this case. *See* Affidavit of Robert Ready ("Ready Affidavit"), Plaintiffs' Response, at 1, ¶ 2. Again, this new business involved the same direct mail promotions for automobile sales as The Ritz Corporation, Presidential, and Premier. *See* Example of Plaintiffs' direct mail material compared with that of Ritz and Presidential, Plaintiffs' Response, Exhibits M through S.

Ready states, however, that "it was my intention at that time to create a new mailpiece [*sic*] which would be substantially different from other mailpieces [*sic*] that were being used in the direct mail advertising business at that time." Ready Affidavit, at 1, ¶ 2. He explains that

> [o]ne of the major differences which I eventually incorporated into my basic mailpiece was a statement to the effect that the sales event to which the prospective customer was being invited did not involve any kind of phony gift.

*Id.* at 2, ¶ 4.

On October 20, 1995, Plaintiffs filed copyright applications for two advertising/promotional letters. *See* Plaintiffs' Patent Applications, Plaintiffs' Opposition, Exhibit Y. These letters are almost identical to each other in content. The first advertising letter was designed for "Gilman Honda," *see id.* at 3, and the second letter was for "Gilman Mitsubishi," *see id.* at 6. On the application for each of these works, there is a space in which Plaintiff Ready was asked to "[briefly] describe the nature of material created by this author in which copyright is claimed." On each application, Plaintiffs answered "Entire Text." *Id.*

---

**4.** Presidential continued to operate in the sales promotion business until its bankruptcy in 1993. *See* Statement of Financial Affairs filed in United States Bankruptcy Court, Central District of California, Defendants' Appendix, Exhibit 23, at 1. At the time of bankruptcy, Kennedy was listed as the sole shareholder of Presidential. *Id.* at 8, ¶ 19(B). On November 30, 1992, Silbert signed a disclaimer stating that he was never properly appointed as President of Presidential. *See* Disclaimer filed with the California Secretary of State, Defendants' Appendix, Exhibit 22.

Plaintiffs filed another copyright application three years later, on October 6, 1998.[5] *See id.* at 7. The title of this work is: "Best representatives of promotional literature." Plaintiffs list this work as a "compilation" and explain that it is a collection of the "best representative promotional literature which in turn is a derivative work from author's prior versions of promotional literature." *Id.*

*Cantrell's Involvement.*—Defendant Cantrell briefly was employed by Ready Productions. In connection with his employment with Ready Productions, Defendant Cantrell signed two contracts. The first document, signed when Cantrell began work on March 6, 1995,[6] is entitled "Non–Disclosure and Non–Compete Agreement." *See* Defendants' Reply, Exhibit 8 (the "March 6th contract"). It states in relevant part that:

> In consideration of being made privy to trade-secret information belonging to Company, Tony Cantrell hereby agrees not to disclose this information to third parties and to treat this information (all company learned information) as a trade-secret belonging to the Company. Also forbidden is working for another business of the same trade as R. Ready Productions, Inc. for 1 year after separation from R. Ready Productions ... Tony Cantrell hereby understands ... that the company's disclosures ... m[a]y not be used in anyway in the future to start his/her own business without authorization from the Company or after 2 years from separation from the Company.

*Id.*, at 1. Later, on May 1, 1995, Cantrell signed an "Independent Contractor Agree-

ment." *See* Defendants' Reply, Exhibit 9 (the "May 1995 contract"). There is no dispute that the May 1995 contract was designed to change Cantrell's relationship with Ready Productions from an "employee" to an "independent contractor."[7] The May 1995 contract required that Cantrell "perform his services in a good and workmanlike manner...." and made no reference to confidentiality or non-compete obligations. The May 1995 contract contained the following clause:

> "ENTIRE AGREEMENT. The within Agreement shall be construed in accordance with Texas law and shall constitute the entire agreement between the parties."

*Id.*

In October 1995, Cantrell left Ready Productions and formed his own business, ACC. *See* Affidavit of Anthony Cantrell, Defendants' Appendix, Exhibit 29, at 3, ¶ 5. Cantrell states that ACC provides direct mail services to automobile dealers in Texas and half a dozen other states. *Id.* at 1, ¶ 2. In doing so, ACC uses direct mail literature that Cantrell alleges is common within the direct mail industry. *Id.* at 2, ¶ 3. Cantrell states that at the time he created his sales materials, he believed that the materials used by Ready Productions were similar to materials used by Ritz and Presidential. *Id.* at 3, ¶ 4. There is no meaningful dispute that Cantrell's and ACC's materials are very similar to Ready Production's copyrighted mailers.

*Scope of Pending Litigation.*—On February 11, 1998, Plaintiffs filed their complaint [Doc. # 1] in federal court. As amended, Plaintiffs' complaint asserts two

---

**5.** This application was submitted eight months after Plaintiffs filed this litigation.

**6.** The parties repeatedly refer to this contract as having been signed in 1995. However, in two places, next to the parties' signatures, the parties wrote the date "3/6/94." *See* Defendants' Reply, Exhibit 8, at 1 and 2 (underline emphasis added). The Court therefore cannot determine with certainty when this contract was executed. This ambiguity is not material,

however, since it was executed prior to the other employment-related agreement in issue.

**7.** Ready explains that this new contract was drawn up because "Mr. Cantrell did not want taxes taken out of his paycheck, and I informed him that in order to do so, he needed to have a d/b/a." *See* Bone/Ritz Suit Deposition of Robert Ready, Plaintiffs' Response, Exhibit B, at 59.

causes of action. *See* First Amended Original Complaint of Plaintiffs R. Ready Productions, Inc. and Robert Ready [Doc. # 15]. In their first cause of action, Plaintiffs claim that they have obtained a valid copyright for two of their versions of the advertising letter, and that Defendants' use of phrases from this letter constitutes copyright infringement. *Id.* at 5, ¶ 14.

Plaintiffs' second cause of action is less clear. Plaintiffs alleged that "[a]ll of Defendants' actions also constitute unfair competition." *Id.* at 5, ¶ 15. Plaintiffs allege more specifically that an integral part of Cantrell's employment contracts with Ready Productions is an agreement "not to disclose or use information designated as 'Confidential Information' upon the termination of his relationship with Ready" (*Id.* at 3, ¶ 8), and that Cantrell breached this duty when he "wrongfully misappropriated copies of the direct mail advertising letter/mailpiece which he wrongfully used in his own business." *Id.* at 4, ¶ 10.

***Assignment of Rights from Kennedy, Ritz and Presidential.***—In May 1998, shortly after Plaintiffs filed suit, Cantrell purportedly purchased the rights to the materials used by The Ritz Corporation and Presidential. First, Cantrell purchased a "Quitclaim Assignment" from James Kennedy. *See* Defendants' Appendix, Exhibit 44. This assignment transferred "the full and exclusive right, title and interest in and to the following intellectual property...." *Id.* This property, listed as Exhibit A to the assignment, included Presidential's training materials, direct mail pieces, pitch book and training videotape. *Id.* On November 24, 1998, Cantrell obtained a similar "Quitclaim Assignment" from Kevin Bone. *See* Defendants' Appendix, Exhibit 45. This instrument transferred a 40% ownership interest in the intellectual property owned by Bone and Ritz. Listed as an Exhibit to the Bone Quitclaim Assignment were the materials covered by this assignment, which included Ritz's training materials, direct mail pieces, and pitch book. *Id.*

In relation to these assignments, Defendants have filed a counterclaim. *See* Defendants Anthony C. Cantrell's and Automotive Consulting Company's Answer to Plaintiffs' First Amended Complaint and Counterclaim [Doc. # 16], at 4. In their counterclaim, Defendants assert seven causes of action: copyright infringement, unfair competition under the Lanham Act, common law service mark infringement, unjust enrichment, unfair competition, conversion, and tortious interference with prospective contracts. In terms of their copyright infringement claim, Defendants state that they have filed separate applications with the United States Copyright Office covering the Presidential and The Ritz Corporation's (and Kevin Bone's) promotional materials that were transferred through the above assignments. *Id.* at 6–7. Defendants argue that Plaintiffs have willfully infringed Defendants' rights in all of these materials. *Id.* at 8.

## II. *SUMMARY JUDGMENT STANDARDS*

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Boze v. Branstetter,* 912 F.2d 801, 804 (5th Cir.1990). Material facts are those facts "that might affect the outcome of the suit under the governing law." *Smith v. Brenoettsy,* 158 F.3d 908, 911 (5th Cir.1998) (quoting *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The facts are to be reviewed with all "justifiable inferences" drawn in favor of the par-

ty opposing the motion. *See Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir.1998) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Laughlin v. Olszewski,* 102 F.3d 190, 193 (5th Cir.1996).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Smith,* 158 F.3d at 911. The burden then shifts to the nonmovant to demonstrate that summary judgment is inappropriate. *See Morris,* 144 F.3d at 380. This is accomplished by producing "significant probative evidence" that there is an issue of material fact so as to warrant a trial. *See Texas Manufactured Housing Ass'n v. Nederland,* 101 F.3d 1095, 1099 (5th Cir.1996), *cert. denied,* 521 U.S. 1112, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997); *Taylor v. Principal Financial Group, Inc.,* 93 F.3d 155, 161 (5th Cir.1996); *Transamerica Ins. Co. v. Avenell,* 66 F.3d 715, 718–19 (5th Cir. 1995); *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.1994), and evidence "sufficient to support a jury verdict." *Morris,* 144 F.3d at 380; *accord Doe v. Dallas Indep. School District,* 153 F.3d 211, 215 (5th Cir.1998).

Plaintiff's burden cannot be met by mere reliance on the allegations or denials in the non-movant's pleadings. *See Morris,* 144 F.3d at 380. Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *See id.* Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* Dispute about a material fact is "genuine" only if evidence is such that

reasonable jury could return a verdict for nonmoving party. *See Stafford v. True Temper Sports,* 123 F.3d 291, 294 (5th Cir. 1997); *Hanks v. Transcontinental Gas Pipe Line Corp.,* 953 F.2d 996, 997 (5th Cir.1992).

In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *See McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.), *revised on other grounds upon denial of reh'g,* 70 F.3d 26 (5th Cir.1995); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc* ), 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *See Little,* 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548).

## III. *APPLICABLE COPYRIGHT LAW*

### A. *Subject of Copyright Laws*

Copyright protection is available for "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a). Copyright protection does not, however, "extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery...." 17 U.S.C. § 102(b).

▮ A key element in any copyright claim is originality. The Supreme Court has stressed that "[t]he *sine qua non* of copyright is originality. To qualify for copyright protection, a work must be original to the author." *Feist Publications v. Rural Tel. Service,* 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Origi-

nality requires "that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.* at 358, 111 S.Ct. 1282 (citing 1 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT §§ 2.01[A], [B] (1990)); *Norma Ribbon & Trimming, Inc. v. Little,* 51 F.3d 45, 47 (5th Cir.1995). Although the amount of required creative input by the author to meet the originality standard is low, "it does exist." *See Feist,* 499 U.S. at 362, 111 S.Ct. 1282. There must be a "distinguishable variation [that is] substantial and not merely trivial." *Norma Ribbon,* 51 F.3d at 47.

■ The principle of originality mandates that objective "facts" and scientific discoveries are not copyrightable. *Feist,* 499 U.S. at 347, 111 S.Ct. 1282 ("[N]o one may claim originality as to facts."), and *passim; Engineering Dynamics, Inc. v. Structural Software, Inc.,* 26 F.3d 1335, 1344 (5th Cir.1994); *see Kepner–Tregoe, Inc. v. Leadership Software, Inc.,* 12 F.3d 527, 534 (5th Cir.1994); *Churchill Livingstone, Inc. v. Williams & Wilkins,* 949 F.Supp. 1045, 1050 (S.D.N.Y.1996); NIMMER ¶ 2.11[A].

■ Similarly, "expressions that are standard, stock or common to a particular subject matter or are dictated by external factors are not protectable under copyright law". *See Engineering Dynamics,* 26 F.3d at 1344. This principle governing common expressions is known as the "scenes a faire"[8] doctrine. *Id.*

■ In addition, ideas or concepts, processes or methods, *per se,* are not protectable. "[W]here there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself, then the expression is unprotected as well." *Kepner–Tregoe,* 12 F.3d at 533; *Kregos v. Associated Press,* 937 F.2d 700, 702 (2d

Cir.1991). This principle, known as the merger doctrine, requires courts to

"focus on whether the idea is capable of various modes of expression." *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1253 (3d Cir.1983). Thus the court must first identify the idea that the work expresses, and then attempt to distinguish that idea from the author's expression of it. If the court concludes that the idea and its expression are inseparable, then the merger doctrine applies and the expression will not be protected.

*Hodge E. Mason and Hodge Mason Maps, Inc. v. Montgomery Data, Inc.,* 967 F.2d 135, 138–40 (5th Cir.1992).

Summarizing the above statutory and common law principles of copyright law, the Fifth Circuit has stated that:

Copyright protects the expression of ideas, not the ideas themselves, and it does not protect processes, methods or scientific discoveries. Other materials not subject to copyright include facts, information in the public domain, and *scenes a faire,* i.e., expressions that are standard, stock or common to a particular subject matter or are dictated by external factors.

*Engineering Dynamics,* 26 F.3d at 1344.

■ It is possible to have copyright protection in a work that is only partially original. Derivative works are those works that are "based upon one or more preexisting works." 17 U.S.C. § 101. With derivative works, copyright protection "covers only those elements contained therein that are original with the copyright claimant." NIMMER § 3.04[A]. Protection again hinges upon the work's originality, as "copyright protection may extend only to those components of a work that are

---

8. This phrase also has been defined as "standard or general themes that are common to a wide variety of works and therefore are not

copyrightable." BLACK'S LAW DICTIONARY (7th ed.1999), at 1346. *"Scenes a faire,"* a french phrase, literally means "scenes for action."

original to the author." *Feist,* 499 U.S. at 348, 111 S.Ct. 1282.[9]

## B. *Copyright Infringement*

■ In order to establish copyright infringement, a plaintiff must establish (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Feist,* 499 U.S. at 361, 111 S.Ct. 1282; *Alcatel USA, Inc. v. DGI Technologies, Inc.,* 166 F.3d 772, 787 n. 57 (5th Cir.1999).

■ *Ownership.*—Ownership is demonstrated by establishing proof of originality, copyrightability, and compliance with applicable statutory formalities. *See Norma Ribbon & Trimming, Inc. v. Little,* 51 F.3d 45, 47 (5th Cir.1995); *Engineering Dynamics,* 26 F.3d at 1340. "[N]o action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a). Failure to register a work does not invalidate the copyright, but rather, it precludes any infringement actions on that work until a valid registration is obtained. *See Raquel v. Education Management Corp.,* 196 F.3d 171, 176 (3d Cir.1999).

■ A valid copyright certificate of registration constitutes *prima facie* evidence of the validity of a copyright. *See Norma Ribbon,* 51 F.3d at 47 (citing 17 U.S.C. § 410(c)). This presumption, however, is rebuttable, as the burden of proof is shifted to the defendant to prove the invalidity of the plaintiff's copyright. *See Entertainment Research v. Genesis Creative Group,* 122 F.3d 1211, 1217 (9th Cir. 1997); *CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.,* 97 F.3d 1504, 1513 (1st Cir.1996); *Masquerade Novelty v. Unique Industries,* 912 F.2d 663, 668 (3d

Cir.1990). In cases in which the originality of a plaintiff's registered work is at issue, the defendant must offer proof "that the plaintiff's product was copied from other works or similarly probative evidence." *See Ocean Coast Properties,* 97 F.3d at 1513 (citing *Masquerade Novelty,* 912 F.2d at 668, 669). Once the defendant offers such proof, the burden shifts back to the plaintiff to demonstrate originality. *See Ocean Properties,* 97 F.3d at 1513.

■ *Copying.*—Copying may be established either directly or indirectly. A plaintiff may indirectly establish copying by demonstrating (1) that defendant had access to the copyrighted material, and (2) there are probative similarities between the copyrighted material and the allegedly copied material. *See Feist,* 499 U.S. at 361, 111 S.Ct. 1282 (proof or access and substantial similarity between the protected or original elements of the works); *King v. Ames,* 179 F.3d 370, 375 (5th Cir.1999); *Engineering Dynamics,* 26 F.3d at 1340; *Kepner–Tregoe,* 12 F.3d at 532. If the works are "so strikingly similar as to preclude the possibility of independent creation, 'copying' may be proved without a showing of access." *Ferguson v. National Broadcasting Co.,* 584 F.2d 111, 113 (5th Cir.1978); *accord Country Kids 'N City Slicks, Inc. v. Sheen,* 77 F.3d 1280, 1284 n. 4 (10th Cir.1996).

■ Not all copying, however, constitutes copyright infringement. *See Engineering Dynamics,* 26 F.3d at 1341; *Kepner–Tregoe,* 12 F.3d at 533. In order to establish copyright infringement, the plaintiff must establish that defendant copied the protectable elements of plaintiff's copyright. *See Kepner–Tregoe,* 12 F.3d at 533; *see also Feist,* 499 U.S. at 348, 111 S.Ct. 1282 ("[A]ccordingly, copyright pro-

---

**9.** An individual may also register a work as a compilation. A compilation is "a work formed by the collection and assembling of preexisting materials ... that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C.

§ 101. In order to qualify as a protectable work, a compilation must (1) have been created through independent selection by an author (*i.e.,* not copied from another work) and (2) display "some minimal level of creativity." *Feist,* 499 U.S. at 358–59, 111 S.Ct. 1282.

tection may extend only to those components of a work that are original to an author.").

Copying is shown through a detailed side by side comparison of the copyrighted and allegedly infringing works. *See King*, 179 F.3d at 376; *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 816 (5th Cir.1997). This determination, the Fifth Circuit has emphasized, "is an issue to be determined by comparison of works, not credibility." *Id.* If there is not literal infringement, there nevertheless may be copyright infringement if there is a "substantial similarity between the two works." *Engineering Dynamics*, 26 F.3d at 1341. Substantial similarity is often determined by the "ordinary observer" test, which provides:

> Two works are substantially similar where "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal [of the two works] as the same."

*Arica Institute, Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir.1992) (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960)); *Churchill Livingstone*, 949 F.Supp. at 1052–53. When a work contains both protectable and unprotectable elements, however, the court must apply the " 'more discerning' ordinary observer" test. *See Hamil America Inc. v. GFI*, 193 F.3d 92, 101 (2d Cir.1999); *see also Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, 166 F.3d 65, 70 (2d Cir.1999); *Kepner–Tregoe*, 12 F.3d at 534–35. "Finally, to determine substantiality of any portion found arguably to have been copied, a

court must determine the copied 'portion's relative importance with respect to the [the copyrighted] over-all work." *Churchill Livingstone*, 949 F.Supp. at 1053 (citing *Altai*, 982 F.2d at 710).

> [T]hus, if the similar material in [the alleged infringer's] work is not a substantial part of [the copyrighted] work, there is no substantial similarity and hence no infringement. The issue is whether that material in [the alleged infringer's] book which is similar to the protected elements in [the copyrighted] book, is substantial in relation to [the copyrighted] book as a whole. There is no magic formula to determine how substantial a similarity must be to constitute infringement. The problem, as one commentator has noted, is one of the "line drawing."

*Id.* (citing 3 NIMMER ON COPYRIGHT § 13.03[A], at 13–29 (1996)). However, even if the amount copied is relatively small, as long as the "copied portion is qualitatively important, the finder of fact may properly find substantial similarity under copyright law...." *Id.* (citing *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1564–65 (Fed.Cir.1992) (citations omitted)); *compare Arica*, 970 F.2d at 1072 (presence of words or phrases similar to those in plaintiff's book on seventy pages in the defendant's book, was insufficient to produce substantial similarity between the two works as a whole).

In determining whether there is substantial similarity that will suffice for proof of infringement, the Court should first filter out all of those elements that are not protected under copyright laws.[10]

---

**10.** Plaintiffs go to great lengths to argue that the "abstraction-filtration" test established by *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir.1992), and used by the Fifth Circuit in *Kepner–Tregoe* and *Engineering Dynamics* only applies in copyright cases that involve computer programs. This argument lacks merit. First, the Court notes that there is significant authority for the proposition that this test should apply to all copyright cases. *See* 3 MELVILLE B. NIMMER & DAVID NIMMER,

NIMMER ON COPYRIGHT § 13.03[F], at 13–119 (1999); *Transwestern Publishing*, 133 F.3d at 777. Second, there is no language in either *Kepner–Tregoe* or *Engineering Dynamics* that suggests that the filtration process is limited to cases involving computer programs. *See Kepner–Tregoe*, 12 F.3d at 536 ("To determine the scope of copyright protection in a close case, a court may have to filter out ideas, processes, facts, idea/expression mergers and other unprotectable elements...."). Last,

*See Transwestern Publishing Co. v. Multimedia Marketing Associates, Inc.,* 133 F.3d 773, 777 (10th Cir.1998); *Williams v. Crichton,* 84 F.3d 581, 583 (2d Cir.1996); *Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1002 (2d Cir.1995); *Engineering Dynamics,* 26 F.3d at 1344; *Kepner–Tregoe,* 12 F.3d at 534. The Court thus must filter out non-protectable material such as facts, ideas, information in the public domain, and words that are encompassed by *scenes a faire. See Engineering Dynamics,* 26 F.3d at 1344.

## IV. *DISCUSSION*

Defendants contend that they are entitled to judgment as a matter of law on all of Plaintiffs' claims. First, Defendants argue that Plaintiffs should not be allowed to maintain a copyright action, as Plaintiffs have acted with unclean hands and have committed a fraud on the Copyright Office. Second, Defendants contend that Plaintiffs' alleged copyrighted works are not subject to copyright protection since they each are derivative or are copies of prior works, and any potentially original elements are not protectable under copyright law. Third, Defendants argue that if Plaintiffs are proper owners of the alleged copyrighted material, they are co-owners with Defendants. As co-owners, Defendants are not liable to Plaintiffs for copyright infringement.

the "abstraction-filtration" test is merely a more formalized application of existing copyright principles. One district court has noted that the "abstractionfiltration-comparison test was nothing new.... [I]n creating the test, the Court drew upon familiar copyright doctrines such as merger and scenes a faire." *Churchill Livingstone,* 949 F.Supp. at 1050 (citing *Altai,* 982 F.2d at 706). The New York District Court noted that:

[a]n elaborate abstraction-filtration-comparison ... may not be necessary in a straightforward textual copyright case.... In a case such as this, simply examining the relevant parts of a copyrighted work will allow a court to apply settled copyright principles and thereby filter out unprotected elements.

Defendants further contend that Plaintiffs' state court claims are without legal and factual merit. Defendants argue that Plaintiffs' unfair competition claim is barred under the applicable statute of limitations. Furthermore, Defendants claim that the contract clause on which Plaintiffs rely was voided by a superceding employment contract between Cantrell and Plaintiffs.

Defendants by their motion also seek the affirmative relief of entry of declaratory judgment that they are the owners or co-owners of the subject works and, conversely, that Plaintiffs are not the owners of the subject works. Finally, Defendants request a judicial declaration that Defendants are entitled to an accounting from Plaintiffs for Plaintiffs' use of copyrighted works to which Defendants have rights superior to Plaintiffs' rights.

### A. *Scope of Plaintiffs' Copyright Claim*

In their Motion, Defendants argue that Plaintiffs lack standing to assert the intellectual property rights of certain third parties. In their Response, Plaintiffs agree with Defendants, and moot this issue by repeatedly stating that all copyright causes of action in Plaintiffs' amended complaint relate only to the mailers that are registered with the United States Copyright Office. *See, e.g.,* Plaintiffs' Response, at 8.[11]

*Id.* (footnote omitted). Therefore, this Court rejects Plaintiffs' attempt to avoid the Court's filtering out those elements of Plaintiffs' work that are not protectable in order to determine substantial similarity as to the balance of the work in issue.

**11.** Plaintiffs state that Silbert granted Ready "a royalty-free, irrevocable, non-exclusive license to Plaintiffs' Third Party Works." Plaintiffs' Response, at 30. Holders of a non-exclusive license lack standing to sue, because they have no ownership interest in the copyright. *See* 17 U.S.C. § 501(a); *MacLean Associates Inc. v. WM. M. Mercer–Meidinger–Hansen, Inc.,* 952 F.2d 769, 778 (3d Cir.1991). Plaintiffs therefore lack standing to enforce the rights of Bone, Silbert, or Kennedy.

## B. *Plaintiffs' Copyright Infringement Claim*

In order to succeed on a copyright infringement suit against Defendants, Plaintiffs must demonstrate that they have a valid copyright on the allegedly infringed works and that Defendants copied protectable elements of Plaintiff's copyrighted works. Plaintiffs have a certificate of registration from the United States Copyright Office, *i.e.*, registered copyright, for the two advertising letters (or "mailers") in question. *See* Plaintiffs' Response, Exhibit Y. Plaintiffs thus have established a *prima facie* case of validity.

Defendants respond that Plaintiffs' copyright is not valid because Plaintiffs' works are not original. Defendants contend that Plaintiffs copied these works from materials previously published by The Ritz Corporation and Presidential. Thus, Defendants argue the presumption created by Plaintiffs' copyright certificate is rebutted. Defendants do not deny Plaintiffs' allegations that Defendants copied Plaintiffs' works.

Defendants may establish circumstantially that Plaintiffs copied their mailers from prior works by demonstrating that Plaintiffs had access to the prior works and that Plaintiffs' work is substantially similar to The Ritz Corporation's and Presidential's materials.[12]

*Access.*—Plaintiffs' own evidence conclusively establishes that Plaintiffs had access to The Ritz Corporation and Presidential materials. Access may be found to exist when the relevant party "had an opportunity to view the protected item." *Wildlife*

*Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 508 n. 5 (7th Cir.1994) (citing 3 NIMMER ON COPYRIGHT, § 13.02[A], at 13–16 (1990)). In his affidavit, Ready states that "[u]ntil some time in December, 1995, I did have in my office a file which contained several Presidential Group letters and contracts with dealers." Ready Affidavit, at 4, ¶ 13. Later in his affidavit, Ready states, "Mr. Silbert informed me that the marketing materials that we used in our business, under the name of Premier Productions Group, had been created by Mr. Silbert and Mr. Kevin Bone, the other founder of The Ritz Corporation." *Id.* at 6, ¶ 19. This testimony is corroborated by a letter sent by Silbert to Ready on February 7, 1997, submitted to the Court by Plaintiffs. *See* Plaintiffs' Response, Exhibit Z. The letters (which Ready concedes he basically drafted) states that:

> In June of 1992, I Randall Silbert left the Presidential Group and formed a partnership with Robert Ready called the Premier Production Group. I took with me those promotional and presentation materials ... that had been developed by the Ritz and the Presidential Group.

*Id.* Silbert also stated in his deposition that "in my association with Robert [Ready] I feel that he was privy to the information I brought with me." Silbert Deposition, Defendants' Appendix, Exhibit 9, at 66.

*Substantial Similarity.*—In cases in which the work at issue contains both protectable and unprotectable elements, the test "must be the 'more discerning' [ordinary observer test], excluding the unprotectable elements from consideration."

---

12. In their Sur–Reply, Plaintiffs argue that the issue of copying arises only under the "second prong" of the copyright infringement test set out in *Feist*. *See* Plaintiffs' Sur–Reply, at 5. This argument misperceives Defendants' strategy. It is permissible in response to Plaintiffs' infringement claim for Defendants to assert the defense that Plaintiffs do not hold valid copyrights. It is for this reason that Defendants offer evidence that Plaintiffs copied their mailers from prior works and thus are not original. The focus here is entirely distinct from Plaintiffs' burden on their infringement to establish that Defendants copied Plaintiffs' copyrighted works. The legal test for copying in each context is the same:

> proof that the plaintiff copied from prior works should involve the same elements ... as are required to establish copying by the defendant from the plaintiff, *i.e.*, access and similarity.

*North Coast Industries v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1034 (9th Cir.1992) (citing NIMMER § 12.11[B], n. 50 (1991)).

*Nihon Keizai,* 166 F.3d at 70; *see Hamil America,* 193 F.3d at 100–01; *Kepner–Tregoe,* 12 F.3d at 534–35.

The Court thus must ascertain which portions of Plaintiffs' copyrighted works are protectable. To do so, the Court will identify and eliminate the unprotectable elements in Plaintiffs' copyrighted works. *See Kepner–Tregoe,* 12 F.3d at 534.

The Court will analyze Plaintiffs' copyrighted works at various levels of abstraction.[13] When Plaintiffs' works are considered on the most general level, Plaintiffs' works do not appear original. In addition, direct mail advertising through personalized letters to customers by automobile dealers to potential customers was the business of The Ritz Corporation and Presidential, and Plaintiffs do not contest this fact. Therefore, Plaintiffs' concept of a direct mail personalized flyers mailed to potential automobile purchasers is not protectable.[14]

When Plaintiffs' works are considered at the "intermediate level of abstraction, such as the structure, sequence and organization of the copyrighted works," *see Kepner–Tregoe,* 12 F.3d at 536, Plaintiffs works also lack originality. Plaintiffs' works contain clearly unprotectable elements and phrases. For ease of analysis, the Court's findings and conclusions on the non-protectable elements of Plaintiffs' works are set forth in chart form, with each phrase or element listed with the copyright doctrine the Court finds applicable.

### CHART I: UNPROTECTABLE ELEMENTS IN PLAINTIFFS' MAILER

| PHRASE | REASON UNPROTECTABLE |
| --- | --- |
| "Mitsubishi: The New Thinking in Automobiles" | *Scenes a faire:* slogan provided by dealer |
| "by GILLMAN MITSUBISHI" | *Scenes a faire:* factual information provided by dealer |
| "a Giant Summer Clearance Sale" | *Scenes a faire:* standard retail sales slogan |
| "GILLMAN MITSUBISHI IS OUT TO REDUCE ITS INVENTORY BY MORE THAN A MILLION DOLLARS!" | *Scenes a faire:* information supplied by dealer |
| "If you are currently in the market for a new MITSUBISHI or a quality pre-owned vehicle, don't miss this" | *Scenes a faire:* standard retail sales slogan Factual information provided by dealer; merger doctrine |
| "Each vehicle will be assigned a Special discount from M.S.R.P" | *Scenes a faire:* standard retail sales slogan Factual information provided by dealer; merger doctrine |
| "No negotiation will be necessary" | *Scenes a faire:* standard retail sales slogan Factual information provided by dealer Merger doctrine |
| "The Greatest Sell–Off of the Season" | *Scenes a faire:* standard retail sales slogan |
| "Rock Bottom Prices" | *Scenes a faire:* standard retail sales slogan |
| "with immediate credit approval" | *Scenes a faire:* factual information provided by dealer |
| "YOUR TRADE–IN (paid off or not)" | *Scenes a faire:* factual information provided by dealer |
| "PAYOFF ON YOUR TRADE" | *Scenes a faire:* factual information provided by dealer |

---

**13.** The Court need not use the formal "abstraction-filtration-comparison" "approved by courts for sophisticated treatment of copyright cases." *Id.; Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 707 (2d Cir.1992). *See supra* note 10.

**14.** Plaintiffs do not appear to contest this conclusion.

| PHRASE | REASON UNPROTECTABLE |
|---|---|
| "Select from more than 100 new MITSU-BISHI sedans, coupes, and trucks including Mirages, Diamantes, Monteros, 3000GT's, 4X4 Trucks, THE ALL NEW 1995 RESTYLED GALANT AND ECLIPSE, and much more! Test drive any one of these vehicles and be prepared to purchase the vehicle of your choice. YOU COULD SAVE THOUSANDS!" | *Scenes a faire:* standard retail sales slogans |
| "YOU COULD SAVE THOUSANDS!" | *Scenes a faire:* standard retail sales slogans |
| "OVER 150 PRE–OWNED VEHICLES WILL BE AVAILABLE DURING THIS SALE" "HUGE SELECTION OF PRE-OWNED PROGRAM AND DEMONSTRATOR VEHICLES ALSO ON SALE!" | *Scenes a faire:* standard retail sales slogans factual information provided by dealer |
| "No phony gifts, no gimmicks, just great savings" | Unprotectable marketing idea Merger doctrine |
| "July 22 from 12:00 PM – 6:00 P.M." [Place and time of sale] | *Scenes a faire:* factual information provided by dealer |
| "Use your current vehicle as a down payment." | *Scenes a faire:* standard retail sales slogans |
| "Your trade may never be worth more!" | *Scenes a faire:* standard retail sales slogans |
| "If there is severe inclement weather on date of sale, voucher will be honored on 7/24/95" | *Scenes a faire:* factual information provided by dealer |
| "Open to private sector. No dealers allowed." | *Scenes a faire:* factual information provided by dealer |

Many elements of Plaintiffs' works are covered by the *scenes a faire* doctrine because they are "expressions that are standard, stock or common to a particular subject matter or are dictated by external factors." *Engineering Dynamics,* 26 F.3d at 1344. Plaintiffs argue that the question of whether certain elements constitute *scenes a faire* doctrine is, in fact, a question of material fact for the jury. *See* Plaintiffs' Response, at 20 (citing *FASA Corp. v. Playmates Toys, Inc.,* 869 F.Supp. 1334, 34 U.S.P.Q.2d 1481, 1493 (N.D.Ill. 1994)). The case cited by Plaintiffs in no way supports Plaintiffs' broad proposition.[15]

■ Plaintiffs argue also that their expression of the idea that there will be "no phony gifts, no gimmicks" was new and

thus is protectable. The Court disagrees. This phrase is unprotectable for two reasons. The phrase merely conveys in a direct manner the marketing concept that no gifts will be given out to customers at the sale. *See Engineering Dynamics,* 26 F.3d at 1344 ("Copyright protects the expression of ideas, not the ideas themselves.") There is no artful or creative phrasing included in Plaintiffs' mailers. Moreover, the copyright merger doctrine renders unprotectable Plaintiffs' manner of expression of the idea concerning no gifts. Here, the expression is nothing but the bare minimum to communicate the idea in issue. Plaintiffs' expression lacks any flourishes that might separate it from the actual idea. *See Montgomery Data,* 967 F.2d at 138–39. Therefore, the Court

15. In *FASA,* the court merely held that the evidence before it was insufficient to find

*scenes a faire* as a matter of law.

finds that Plaintiffs' expression of the idea of no gifts or gimmicks to be indistinguishable from the idea itself, and the expression is not a protectable element of Plaintiffs' works. Plaintiffs have failed to establish a genuine question of material fact concerning this marketing concept.

The Court therefore concludes that each of the phrases and elements from Plaintiffs' work in the chart above are either such common slogans in retail advertising and sales for automobiles, as well as innumerable other products, or are mere explanations of facts provided by the dealer, that no reasonable person could find the *scenes a faire* doctrine inapplicable to the quoted phrases.

■ *Copied Elements.*—In order to determine whether summary judgment is appropriate on the issue of substantial similarity in the case at bar, the Court must determine what portions of the potentially protectable elements of the copyrighted works are in fact original expressions or phrases. Defendants have offered a variety of examples of allegedly relevant prior work from The Ritz Corporation and Presidential. For purposes of this analysis, the Court will examine the works on which Plaintiffs focus their arguments. *See* Plaintiffs' Response, at 18, and Exhibits M through S, encompassing Defendants' Exhibits 54 (Presidential's mailer), 64 (Presidential's mailer), 68(b) (Ritz's mailer), 68(c) (Ritz's mailer), 68(d) (Ritz's mailer), 68(e) (Ritz's mailer), and 68(f) (Ritz's mailer).

The Court finds that Plaintiffs' own exhibits and argument reveal that most, if not all, of the potentially protectable phrases in Plaintiffs' work are *not* original. A side-by-side comparison of The Ritz Corporation and Presidential advertising letters with Plaintiffs' registered works demonstrates that the potential protectable portion of Plaintiffs' works, as a matter of law [16] are substantially similar to various prior works. The elements of Plaintiffs' work that are substantially similar to those in prior works are cross-referenced below with the pertinent similar phrase from the prior works:

| PHRASE | | REASON UNPROTECTABLE |
|---|---|---|
| **CHART 2** | | |
| **PHRASES IN PLAINTIFFS' MAILER ALSO PRESENT IN PRIOR WORKS** | | |
| PHRASE IN PLAINTIFFS' MAILER | PHRASING IN PRIOR WORK | DEFENDANTS' EXH. NOS. |
| **Check at the top with addressee's name** | Exactly same | 54, 64, 68(b) |
| **"Exclusive Invitation"** | Exactly same | 54, 64, 68(b), 68(d), 68(e) |
| *(same as above)* | "by invitation only" | 68(c) |
| **"Dear Mr. Sample"** | "Mr. Sample" | 64 |
| *(same as above)* | "Dear Mr. Sample" | 68(b), 68(c), 68(d) |
| **"You and your family have been selected from a group of preferred guests ... to participate in"** | "You and your family have been selected to participate in a very prestigious event" | 68(c) |

**16.** A constant theme throughout Plaintiffs' briefing is that originality is an issue that may not be decided on summary judgment. *See, e.g.,* Plaintiffs' Response, at 15, 20; Plaintiffs' Sur–Reply, at 3. This is a misconstruction of the law. In a recent case, the Fifth Circuit upheld a district court's finding on summary judgment that the works in question were not substantially similar. *See Creations Unlimited, 112 F.3d at 816; see also Kregos,* 3 F.3d at 663; *Churchill Livingstone,* 949 F.Supp. at 1049 (citing *Warner Bros., Inc. v. American Broadcasting Co.,* 720 F.2d 231, 239–40 (2d Cir.1983)) (finding that summary judgment is proper if court finds that "no reasonable jury" could conclude that works are substantially similar).

| Phrase in Plaintiffs' Mailer | Phrasing in Prior Work | Defendants' Exh. Nos. |
|---|---|---|
| *(same as above)* | "You and your family are cordially invited to a very special event announced by invitation only" | 68(f) |
| *(same as above)* | "Mr. Sample, as a member of this select group of registered owners" | 64 |
| "As a result, you and your family are invited to a very special sales event on [date]" … "This event is by invitation only and is not being advertised to the public...." "this SPECIAL PRIVATE SALES EVENT that features exclusive discounts for those who present this invitation." | "by invitation only. There has been no public advertising" | 68(c) |
| *(same as above)* | "This event is exclusive and will not be open to the public" | 68(e) |
| *(same as above)* | "You and your family have been invited to attend a special private invitation only sale.... This sale will not be open to the public" | 68(d) |
| "bring this invitation and present it to the hostess in the showroom" | "Simply present this invitation to the hostess inside the showroom" | 68(b) |
| *(same as above)* | "Private offer with this invitation" "Exclusive offer. You must present this invitation." | 68(e) |
| "sales event on [date] from 12:00 PM – 6:00 PM" | "This special sale is for six hours only" | 68(b) |
| "Gilman Mitsubishi is out to reduce its inventory by more than a million dollars" | "Giant Inventory Reduction Sale" | 64, 68(b) |
| *(same as above)* | "De Anza Chevrolet has a major problem, De Anza Chevrolet has to pay a penalty of huge amounts of interest to the bank for their entire overstocked inventory ... Rather than paying the bank ... De Anza Chevrolet would like to pass the savings on to you" | 68(e) |
| "Finance representatives will be on hand to assist you" | "Special finance personnel will assist in immediate delivery of all purchases and leases on approved credit" | 68(d) |
| *(same as above)* | "Finance representatives will be present for this sale to assist with credit approval" | 64 |
| "To insure immediate results, please remember to bring this invitation ... along with: Title, payment book, all decision-makers, current registration, your trade-in" | "So bring this invitation, your trade-in, Title or payment book, all decision makers" | 68(c) |
| *(same as above)* | "Bring this invitation, your trade-in, pink slip or payment book, all decision makers ... and come prepared to buy" | 68(f) |
| *(same as above)* | "So bring your title or payment book, registration, all decision mak- | 64 |

| Phrase in Plaintiffs' Mailer | Phrasing in Prior Work | Defendants' Exh. Nos. |
|---|---|---|
| | ers, and be prepared to purchase the model of your choice" | |
| *(same as above)* | "Come prepared to buy! Bring all decision makers | 68(b), 64 |
| *(same as above)* | "Bring your trade-in" ... "P.S. Present this letter at the sales entrance" | 54 |
| "No phony gifts, no gimmicks, just great savings" | "There are no frills, no free gifts ... just serious savings" | 54 |
| *(same as above)* | "This is an honest sale, no tricks or gimmicks" | 68(e) |
| "Complementary valet parking" | "Free valet parking will be available for your convenience" | 68(c) |
| "Complimentary food and refreshments for the entire family" | "Each guest will receive a valuable gift along with catered food and beverages" | 68(e) |
| *(same as above)* | "Free food and refreshments for the entire family" | 64 |
| "Official appraisers and buyers will be present to give you an immediate appraisal on your car" | "Used car buyers will be on hand to ensure you get the fairest price for your car" | 68(b) |
| *(same as above)* | "Licensed California used car appraisers will be on hand to give yo top dollar for your used vehicle" | 68(d) |
| *(same as above)* | "De Anza Chevrolet has contracted special used car buyers to buy all trade ins" | 68(e) |
| *(same as above)* | "Special used car appraisers will be on hand to create a bidding war on your trade in" | 64 |
| "Rock Bottom Prices" | "Rock Bottom Prices" | 68(f) |
| "You could save thousands" | "You could save thousands" | 68(f) |
| "Don't miss this event! One Day Only!" | "This authorized reduction will be for one day only" | 64 |
| *(same as above)* | "one day only" | 68(c), 68(f) |
| "Over 150 pre-owned vehicles will be available during this sale" | "Over 100 hand-picked, specially selected used vehicles will be included in this sale" | 64 |
| *(same as above)* | "Over 150 new ... and pre-owned vehicles | 68(c) |

---

The Court concludes under the " 'more discerning' ordinary observer" test, that no reasonable person comparing the identified phrasing in Plaintiffs' works with the comparable phrases in the specified prior works could find that the identified phrases in Plaintiffs' works are not copied.[17]

---

17. Plaintiffs contend that summary judgment is improper on the issue of substantial similarity. Although this issue is fact intensive, it is not impermissible for a court to employ the summary judgment process in appropriate cases. *See, e.g., Norma Ribbon,* 51 F.3d at 46; *Creations Unlimited,* 112 F.3d at 815. The rationale is explained as follows:

If the similarity between plaintiff's and defendants' books *concerns non-copyrightable material, or if the substantiality of the similarity between the copyrightable elements is or is not "so clear"* as to fall outside the range of reasonably disputed fact questions requiring resolution by a jury," summary judgment is appropriate. However, as long

Plaintiffs' have failed to establish a genuine question of fact as to the absence of originality in the quoted phrases of the copyrighted works.[18]

***Plaintiffs' Proof of Originality.***—Plaintiffs offer no additional evidence of originality. In their Response, Plaintiffs do point out that, "most importantly, Mr. Ready has specifically testified that he did not copy any fragments from any pre-existing materials." Plaintiffs' Response, at 17. This self-serving and unsupported personal assertion is strongly contradicted by the access Plaintiff Ready had to the earlier works through his employment history with Presidential and Premier, and by the obvious substantial similarity between the phrasing, structure, layout and concept between Plaintiffs' works and the prior works to which he had access. In any event, the intent of Plaintiffs is irrelevant. This comports with the general view of intent in copyright infringement cases. *See Repp v. Webber,* 132 F.3d 882, 889 (2d Cir.1997) (holding that "the fact that infringement is 'subconscious' or 'innocent' does not affect liability"); *see also Pinkham v. Sara Lee,* 983 F.2d 824, 829 (8th Cir.1992) (finding that "the defendant is liable even for 'innocent' or 'accidental' infringements"); *Costello Publishing Co. v. Rotelle,* 670 F.2d 1035, 1044 n. 13 (D.C.Cir.1981) ("Intent is not an element of . . . copyright infringement.").

***Conclusion of Copyright Invalidity Defense.***—After eliminating all of the non-original phrases as well as the non-protectable elements quoted in the foregoing charts, there is not a scintilla of protectable originality in Plaintiffs' registered works. This is demonstrated visually in Appendix "A" to this Memorandum Opinion and Order, which is a reproduction of the text of one of Plaintiffs' copyrighted works showing the unprotectable elements in bold and the copied (non-original) portions highlighted in grey. When these elements all are removed, there is virtually nothing left in Plaintiffs' works to be validly protected by a copyright. *See* Appendix "B" (reflecting the words remaining in Plaintiffs' work after elimination of the all the unprotectable and non-original phrases).

In summary, the Court concludes that Defendants have overcome the presumption of originality reflected by Plaintiffs' copyright registration certificates. Thus, Defendants are entitled to summary judgment on Plaintiffs' copyright infringement claim, having demonstrated that Plaintiffs' copyrights are invalid as a matter of law.

## C. *Fraud on the Copyright Office*

██ Defendants argue that Plaintiffs committed fraud on the United States Copyright Office when they registered their two copyrights in 1995. Under copyright law, "the knowing failure to advise the Copyright Office of [material] facts . . . constitutes grounds for holding the registration invalid and incapable of supporting an infringement action." *See Raquel,* 196 F.3d at 177; *see also Eckes v. Card Prices Update,* 736 F.2d 859, 861–62 (2d Cir.1984) (finding that the knowing failure to "advise the Copyright Office of facts which might have occasioned a rejection of the application" enough to preclude infringement action).

---

as reasonable minds could differ on the issue of substantial similarity, summary judgment is inappropriate.
The determination of substantial similarity is necessarily fact intensive and requires a detailed examination of both works. However, when a copyrighted work includes both protectable and unprotectable ele-

ments, a court must filter out all unprotectable elements and "take care to inquire only whether 'the protectable elements, standing alone, are substantially similar.' " *Churchill Livingstone, Inc.,* 949 F.Supp. at 1049–50 (emphasis added, citations omitted).

**18.** The Court reaches this same result when it uses the simpler "ordinary observer" test.

Defendants have demonstrated without meaningful contradiction that the overall concept behind and numerous elements of Plaintiffs' registered works are plainly copied from existing works by The Ritz Corporation and Presidential. Nevertheless, Plaintiffs failed to disclose in their registration application that there were preexisting mailers on which Plaintiffs' works were substantially based. In their applications, however, Plaintiffs falsely claimed authorship of the "entire text." Plaintiffs thus failed to inform the Copyright Office of crucially material facts. The existence of the prior works would have occasioned the rejection of Plaintiffs' applications. At best, Plaintiffs' works could be described as "derivative works."

The Court also finds Defendants have established without genuine contradiction that this was not an inadvertent error. At the time Ready created his mailers, he knew of the substantially similar works by the owners of The Ritz Corporation and Presidential. The Court finds that Ready's employment with Presidential and his access to the prior works of both The Ritz Corporation and Presidential leads inescapably to a finding that Ready knowingly failed to advise the Copyright Office of material facts.[19] This constitutes inequitable conduct that invalidates Plaintiffs' copyrights.

## C. *Plaintiffs' State Court Claims*

*Unfair Competition Claim.*—The Court also concludes that Plaintiffs' unfair competition claim fails as a matter of law. In their First Amended Complaint, Plaintiffs allege that Defendant Cantrell signed an agreement in which he "agreed not to disclose or use information designated as 'Confidential Information' upon the termination of his relationship with Ready." Plaintiffs' First Amended Complaint, at 3, ¶ 8. Plaintiffs also allege that "when Cantrell left Ready he wrongfully *misappropriated* copies of the direct mail advertising letter/mailpiece [*sic*] which he wrongfully used in his own business constituted a breach of the relevant contract," and "Cantrell's wrongful misappropriation and unauthorized use of the copyrighted letter/mail-piece [*sic*] was an intentional breach of this duty owed to Ready." Plaintiffs' First Amended Complaint, at 4, ¶¶ 10, 11 (emphasis added). Plaintiffs' unfair competition claim thus explicitly is based on Cantrell's alleged misappropriation of trade secrets.

Despite these allegations, Plaintiffs attempt to argue that their unfair competition claim does not involve the misappropriation of trade secrets. *See e.g.,* Plaintiffs' Sur–Reply, at 18. This argument, however, tortures the plain language of Plaintiffs' First Amended Complaint, and represents an impermissible attempt belatedly to amend Plaintiffs' pleadings long after discovery is closed. *See Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir.1996) (finding that allegations in a response to a motion are not sufficient to amend the complaint).[20]

**19.** To the extent that Plaintiffs' 1998 application was intended as a supplement to Plaintiffs' original application, it does not change the Court's conclusion. This supplement is irrelevant to this case since Plaintiffs have specifically limited their claims to the two 1995 applications. *See* Plaintiffs' Response, at 12 n. 38. In any event, under regulations passed pursuant to 17 U.S.C. § 408(d), an individual who has filed a copyright registration form may file an "application for supplementary registration" to either (1) correct an error in the original application, or (2) amplify the information in the original application.

Copyright Office and Procedures General Provisions, 37 C.F.R. § 201.5. The information in a supplemental registration "augments but does not supersede that contained in the earlier registration." 17 U.S.C. § 408(d). Thus, Plaintiffs cannot retroactively change the authorship stated in their original registration through a supplementary registration.

**20.** Plaintiffs acknowledge they do not seek to resuscitate that claim which was litigated previously and concluded. Defendants' Sur–Reply, at 18 and nn. 50, 51.

■ In any event, Plaintiffs' unfair competition claim is barred by the Texas statute of limitations. Claims of unfair competition through misappropriation of trade secrets and other unfair competition claims are subject to a two year statute of limitations. *See* Tx.Civ.Prac. & RemCode § 16.003. Plaintiffs' unfair competition claim sounds in tort, whether the allegedly misused property was a trade secret or not. *See United States Sporting Products, Inc. v. Johnny Stewart Game Calls, Inc.,* 865 S.W.2d 214, 218 (Tex.App.—Waco 1993, writ denied).[21] "The doctrine of misappropriation is a branch of the tort of unfair competition which involves the appropriation and use by the defendant, in competition with the plaintiff, of a unique pecuniary interest created by the plaintiff through the expenditure of labor, skill and money. It is recognized under Texas law." *Id.* at 216 (citing *Universal City Studios v. Kamar Industries,* 217 U.S.P.Q. 1162, 1982 WL 1278 (S.D.Tex.1982) (citations omitted)). Thus, Plaintiffs' unfair competition claim is governed by Texas's two-year statute of limitations. *See Daboub v. Gibbons,* 42 F.3d 285, 290 (5th Cir.1995) ("The state law limitations period for some of the alleged causes of action, such as misappropriation, unfair competition, and conversion, is two years.") (citing Tex.Civ.Prac. & Rem.Code § 16.003); *see also Derrick Manufacturing Corp. v. Southwestern Wire Cloth,* 934 F.Supp. 796, 806 (S.D.Tex. 1996) (finding that unfair competition claims are governed by a two year statute of limitations and noting that "the Court has discovered no cases in which the four year period was applied to an unfair competition claim").

■ An unfair competition claim for misappropriation of trade secrets accrues and the limitations period commences when the trade secret allegedly misappropriated is actually used by the defendant. *See Computer Associates International, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex.1996). Under Texas law, the "discovery rule," *i.e.,* postponement of accrual of certain causes of action for purposes of the statute of limitations, does not apply to a claim of unfair competition based on misappropriation of trade secrets. *Id.* at 457. There is no reason that this same rule would not apply to other unfair competition claims when the plaintiff complains about a defendant's misuse of other proprietary information or the products of allegedly extensive work developed by the plaintiff.

Plaintiffs' unfair competition claim is time barred. Cantrell began to work at ACC in October 1995. Plaintiffs contend the tortious conduct occurred at or about that time. In fact, Plaintiffs complain about a mailpiece by Cantrell dated November 25, 1995. *See* Plaintiffs' Response, Exhibit H. Plaintiffs, however, did not file their complaint in this Court until February 11, 1998, well outside the applicable two year limitations period.

■ *Breach of Contract Claim.*— Plaintiffs also assert a breach of a contractual non-competition clause that appears in the parties' March 6th contract. *See* Plaintiffs' First Amended Complaint, ¶ 10. Defendants contend that Plaintiffs' contract claim is without merit because the March 6th contract explicitly was superceded by the subsequent May 1995 contract.

To the extent they were included in Plaintiffs' First Amended Complaint, Plaintiffs' breach of contract claim fails as a matter of law. In the March 6th contract, there were two distinct duties: one was not to disclose confidential information, and the other was a commitment not

---

**21.** Plaintiffs do not dispute this principle since they cite this case to the Court. *See*

Plaintiffs' Response, at 19 n. 55.

to compete with Ready Productions. The May 1995 contract altered Cantrell's employment relationship with Ready Productions, making him an independent contractor, rather than an employee.

"The May 1995 contract contained the following integration clause:

ENTIRE AGREEMENT. The within Agreement shall be construed in accordance with Texas law and shall constitute the entire agreement between the parties."

*Id.* Plaintiffs do not deny the existence of this integration clause. The clause is valid and binding on the parties.

 Under Texas law, an integration clause operates to memorialize the common law doctrine of merger. *See Smith v. Smith,* 794 S.W.2d 823, 828 (Tex.App.—Dallas 1990); *accord GXG, Inc. v. Texacal Oil & Gas,* 977 S.W.2d 403, 417 (Tex.App.—Corpus Christi 1998); *Fish v. Tandy Corp.* 948 S.W.2d 886, 899 (Tex.App.—Fort Worth 1997, writ denied). Under this contract merger doctrine, one contract may be extinguished through its absorption into a subsequent agreement between the parties. *See Smith,* 794 S.W.2d at 827. The key element in determining whether the prior contract is extinguished is the parties' intent as expressed in the relevant contracts. *See id.*

The language of the May 1995 contract expresses that Plaintiffs' and Cantrell's intention to supersede the March 6 contract entirely. While the parties now agree that the purpose of the May 1995 contract was to permit Cantrell to switch roles from an employee to an independent contractor, the parties elected to sign a written and fully integrated document. The May 1995 contract was drafted by Ready on behalf of both Plaintiffs. That agreement expressly

included a broad integration clause that did not make any exceptions. Both contracts addressed the same general subject: Cantrell's employment with Ready Productions. The language of the May 1995 contract, the parties' later agreement, clearly intends to supersede the March 6th agreement altogether. Plaintiffs cannot now vary or contradict the integration clause with self-serving parol evidence.

Plaintiffs argue that the two contracts are separate and distinct agreements that cover different aspects of Cantrell's employment concurrently. Plaintiffs' argument contravenes the integration clause language. *Lewis v. Adams,* 979 S.W.2d 831, 836 (Tex.App.—Houston [14th] 1998, no writ). Plaintiffs are bound by their own agreement and it is they who must bear responsibility for their own failure to include new confidentiality or non-compete clauses or to incorporate by prior reference the contract as an exception to the clear merger clause in the May 1995 contract.[22] Plaintiffs' breach of contract claim must be dismissed.

### D. *Defendants' Motion for Declaratory Judgment*

Defendants' Motion for Declaratory Judgement contains three basic requests. First, Defendants request a declaration that "Defendants are owners or co-owners of the subject works." Defendants' Motion, at 3. Second, Defendants ask the Court to find that "Plaintiffs are not the owners of the subject works." Last, Defendants state that they "are entitled to an accounting from Plaintiffs for Plaintiffs' use of Defendants' copyrighted works." *Id.*

### *Defendants' Ownership Interest in Presidential and The Ritz Corporation*

---

**22.** To the extent that Plaintiffs argue that the 1995 contract is ambiguous, the Court notes that Texas contract law demands that the Court construe that contract strictly against the drafter. *See SMB Partners v. Osloub,* 4 S.W.3d 368, 371 (Tex.App.—Hous. [1st] 1999).

*Materials.*—Defendants have presented evidence that demonstrates that they have an ownership interest in the Presidential and The Ritz Corporation materials. There is no dispute that Bone and Kennedy owned interest in the intellectual property that was created at The Ritz Corporation or Presidential when they assigned their interests to Cantrell. Defendants obtained "Quitclaim Assignments" from Bone and Kennedy transferring their interests in this property to Defendants. *See, e.g.,* Plaintiffs' Sur–Reply, at 17. A "quitclaim" transfer, by definition, is "a formal release of one's claim or right." BLACK'S LAW DICTIONARY, at 1262 (7th ed.1999). Plaintiffs submit no evidence or argument suggesting that this quitclaim transfer was invalid. Defendants therefore received a quitclaim title in 100% of whatever Kennedy's interest in the Presidential materials and 40% of Bone's interest.

In response, Plaintiffs do not contest these matters. Rather, Plaintiffs contend that the quitclaim assignments that Cantrell obtained from various now-defunct automotive direct mail companies are not conclusive, and that Cantrell only received the intellectual property to the extent that Bone and Kennedy owned it. *See* Plaintiffs' Sur–Reply, at 17. Plaintiffs further contend that these third parties did not offer a warranty deed and may have lacked "confidence in the validity of their ownership of the copyrights." *Id.* Plaintiffs deduce from this vague assertion that the "ownership of these pieces of intellectual property is a question of fact for the jury to decide." *Id.*[23]

The Court concludes that Defendants' Motion for Declaratory Judgment should be granted in part and denied in part. Certain legal conclusions can be drawn. First, Plaintiffs have no ownership interest in either the Ritz or Presidential materials, and do not contend otherwise. *See supra,* at 5 (noting that Ready disclaims any ownership interest in both the Ritx and Presidential materials). Furthermore, it is clear that Plaintiffs lack standing to enforce the rights of any third party owners of such works. *See* authorities cited *supra* at 21, note 11. Second, Defendants possess valid quitclaim assignments from both Bone and Kennedy. Therefore, the Court concludes that Defendants are the rightful owners of 100% of Kennedy's intellectual property interest and 40% of Bone's intellectual property interest. However, the Court cannot define with precision the exact contours of Bone and Kennedy's interests vis-a-vis Silbert's property interest in these materials on the existing and legal record. It is uncontroverted that Silbert retained no stock ownership in either The Ritz Corporation or Presidential. It is also clear that Silbert renounced his officer status in Presidential. The Court, cannot rule on any other potential theories of ownership that Silbert may assert, or decide any issues relating to Bone and Kennedy's potential copyright interests at the time of the quitclaim assignments to Cantrell. Defendants have failed to adequately present factual and legal authorities justifying summary judgment on these issues.

***Defendants' Entitlement to an Accounting.***—The Court concludes that Defendants are not entitled to an accounting. It is undisputed that Plaintiffs have no ownership interest in The Ritz Corporation and Presidential materials. Thus, an "accounting" as that term is defined under copyright law, would be improper.[24]

---

**23.** Plaintiffs originally incorrectly stated that "[i]t is important to note that all Mr. Cantrell obtained were quitclaims (not assignments) from the would-be 'owners' of the Third Party Works." Plaintiffs' Response, at 7 n. 28.

**24.** Discussing the right to an accounting, the Fifth Circuit has stated

It is widely recognized that "[a] co-owner of a copyright must account to other co-owners for any profits he earns from the licensing or use of the copyright...." Significantly, "the duty to account *does not* derive from the copyright law's prescription of infringement. Rather, it comes from '...

## V. *CONCLUSION*

For the reasons discussed above, the Court concludes that Defendants' Motion for Summary and Declaratory Judgment [Doc. # 31] should be **GRANTED in part** and **DENIED in part**. It is therefore

**ORDERED** that Defendants' Motion for Summary Judgment [Doc. # 31] is **GRANTED**. Plaintiffs' copyright, unfair competition and contractual claims are dismissed with prejudice. It is further

**ORDERED** that Defendants' Motion for a Declaratory Judgment [Doc. # 31] is **GRANTED** in part and **DENIED** in part. It is **GRANTED** to the extent described above. Defendants' Motion for a Declaratory Judgment is **DENIED** to the extent that Defendants request declarations concerning the ownership interests of third

general principles of law governing the rights of co-owners.' "
*Goodman v. Lee,* 78 F.3d 1007, 1012 (5th Cir.), *cert. denied,* 519 U.S. 861, 117 S.Ct. 166, 136 L.Ed.2d 108 (1996) (footnotes omitted).

parties and an accounting from Plaintiff. It is further

**ORDERED** that both parties appear before the Court on **January 14, 2000** at 4:00 p.m. for a pretrial conference on Defendants' remaining counterclaims, to the extent a trial is necessary. The parties shall submit a joint pre-trial order on or before January 13, 2000, in the form prescribed by this Court's Procedures. It is finally

**ORDERED** Plaintiffs shall send a copy of this Memorandum Opinion to all parties and to each presiding judge in all cases filed by Plaintiffs related to this suit.

A separate order will issue dismissing the related cases pending before the undersigned involving Plaintiffs' claims of contributory infringement.

The Court has found that Ready has no ownership interest in either the Presidential or Ritz materials. He cannot be a co-owner, and therefore, an accounting would be improper.

**APPENDIX "A"**

note: unprotectable elements shown in bold and the copied (non-original) portions highlighted in grey]

| | | |
|---|---|---|
| GILLMAN MITSUBISHI | | Non-Negotiable |
| MITSUBISHI | | Coupon |
| The New Thinking | 3501 B.E. Terry Blvd. | |
| in Automobiles | US 59 exit FM 2218 (2 blocks West) | Date 7/22/95 |
| | Rosenberg, Texas 77471 | |

| | Dollars | Cents |
|---|---|---|
| THE SUM OF THREE THOUSAND | $3,000 | 00 |

Pay to
the order of: Mr. John A. Sample This is not a check
 123 Anytown
 Anytown, US

---

**MITSUBISHI**
**The New Thinking in Automobiles**
**EXCLUSIVE INVITATION**

Dear Mr. Sample,
PLEASE READ CAREFULLY FOR YOUR BENEFIT!
You and your family have been selected from a group of PREFERRED GUESTS by GILLMAN MITSUBISHI to participate in a GIANT SUMMER CLEARANCE SALE! As a result, you and your family are invited to a very special sales event on JULY 22ND from 12:00 PM - 6:00 PM. This event is by invitation only and is not being advertised to the public in any other form of media.

If you are currently in the market for a new MITSUBISHI or quality pre-owned vehicle, don't miss this SPECIAL PRIVATE SALES EVENT that features exclusive discounts for those who present this invitation. Each vehicle will be assigned a SPECIAL DISCOUNT FROM M.S.R.P.! No negotiation will be necessary! GILLMAN MITSUBISHI IS OUT TO REDUCE ITS INVENTORY BY MORE THAN A MILLION DOLLARS!

**THE GREATEST SELL-OFF OF THE SEASON!**
**ROCK BOTTOM PRICES!!**

Finance representatives will be on-hand to assist you with immediate credit approval. To ensure immediate results, please remember to bring this invitation and present it to the hostess in the showroom along with:

* TITLE * PAYMENT BOOK
* ALL DECISION MAKERS * CURRENT REGISTRATION
* YOUR TRADE-IN (Paid off or not) * PAYOFF ON YOUR TRADE

**\*\* NO PHONY GIFTS, NO GIMMICKS, JUST GREAT SAVINGS!!\*\***
Select from more than 100 new MITSUBISHI sedans, coupes, and trucks including Mirages, Diamantes, Monteros, 3000GT's, 4X4 Trucks, THE ALL NEW 1995 RESTYLED GALANT AND ECLIPSE, and much more! Test drive any one of these vehicles and be prepared to purchase the vehicle of your choice. YOU COULD SAVE THOUSANDS!

* OVER 150 PRE-OWNED VEHICLES WILL BE AVAILABLE DURING THIS SALE
* HUGE SELECTION OF PRE-OWNED PROGRAM AND DEMONSTRATOR VEHICLES
ALSO ON SALE!

\*\* COMPLIMENTARY VALET PARKING \*\*
\*\* COMPLIMENTARY FOOD AND REFRESHMENTS FOR THE ENTIRE FAMILY! \*\*

WHERE: GILLMAN MITSUBISHI WHEN: SATURDAY, JULY 22ND
 3501 B.F. TERRY BLVD. 12:00PM - 6:00PM
 US 59, EXIT FM 2218 (2 BLOCKS WEST) INFO: 713-342-6363
 ROSENBERG, TX 77471

IF THERE IS SEVERE INCLEMENT WEATHER ON DATE OF SALE, VOUCHER WILL BE HONORED ON 7/24/95. Use your current vehicle as a down payment. Official appraisers and buyers will be present to give you an immediate appraisal on your car. Your trade may never be worth more!

**DON'T MISS THIS EVENT!**
**ONE DAY ONLY!**
Copyright of R. Ready Productions, Inc. 1995 Open to private sector only. No dealers allowed.

P:\ORDERS\11-1995\0401m&o 000106.1547 45

## APPENDIX "B"

PLEASE READ CAREFULLY FOR YOUR BENEFIT!

Copyright of R. Ready Productions, Inc. 1995